UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| LAURA KORTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 4:21-CV-33-PPS |
| | ) |
| INDIANA UNIVERSITY HEALTH, INC., | ) |
| | ) |
| Defendant. | ) |

# **OPINION AND ORDER**

Plaintiff, Laura Korty, was a Clinical Nurse Quality Coordinator for Indiana University Health ("IUH") when she decided to voluntarily resign. During the process of training her male replacement, Korty discovered he was making $15,000 more than she had been earning. That realization prompted this lawsuit under the Equal Pay Act which IUH now seeks summary judgment on. Because the undisputed facts demonstrate that the pay disparity between Korty and her replacement was due to factors other than sex, summary judgment must be granted.

## **Background**

At the outset, I note that Korty has filed a motion to strike. [DE 37.] Korty seeks to exclude from the summary judgment record some hearsay testimony and certain facts mentioned by IUH that she claims are irrelevant. [DE 37.] Because I have not relied on any of that evidence in my decision in this case, I will deny that motion as moot.

IUH is a healthcare system based in Indianapolis, with dozens of facilities

statewide. [Baker Dec., DE 33-1, at 1.][1] IUH Arnett Hospital is located in Lafayette, Indiana, and is part of IUH's West Central Region. *Id.* Max Foxen is Compensation Manager for IUH. [Foxen Dep., DE 33-2, at 2.] In that role, he helps create guidelines for IUH Talent Acquisition Consultants to follow when setting compensation offers for employees. *Id.* Factors to consider for new hires include pay range, internal equity, prior relevant work experience, and budget. [*Id.* at 2, 10.] IUH uses the term "internal equity" to review the pay of current IUH employees to determine where to slot the new hire. [*Id.* at 3.] IUH's policy permits pay differences between individuals in the same job code based on relevant work experience, performance, or seniority. *Id.* According to Foxen, talent acquisition coordinators should generally avoid new hire rates that are higher than incumbent pay; however, exceptions may occur, including when a current IUH employee experiences a demotion. *Id.* In other words, when a current IUH employee is hired for a position where his or her current base pay is above the new pay (i.e. a demotion), talent acquisition coordinators can take that into account, while also considering relevant experience and internal equity. *Id.*

Korty started working with IUH as a patient care intern in December 2010 and then transitioned to a registered nurse role in October 2011. [Korty Dep., DE 33-3, at 7-8.] In June or July 2012, Korty transferred to a registered nurse role at IUH Arnett

---

[1] There are a lot of different pieces of evidence in the record including deposition excerpts, declarations, and exhibits produced during discovery. For the sake of consistency, the citations in this order are to the blue CM/ECF page number at the top of each page.

Hospital, where she stayed until the summer of 2015, when she resigned. [*Id.* at 8-9.] In March 2017, Korty returned to IUH Arnett as an outpatient float nurse. [*Id.* at 10.] In October 2017, Korty applied for and received the position of specialist medical staff quality and peer review nurse at IUH Arnett, which later became known as the Clinical Nurse Quality Coordinator. [*Id.* at 11.] Korty started reporting to Laura Baker, Director of Quality, Patient Safety and Infection Prevention of IUH Arnett. [*Id.* at 19.]

In that final position, Korty screened cases for IUH Arnett's committees (i.e., emergency room, surgery, pediatrics, etc.), to determine if the case needed to go through the peer review process, as well as assigning the cases to correct committees, setting up agendas for the meetings, attending the meetings, and taking minutes. [DE 33-3 at 14.] She also coordinated ongoing professional practice evaluations for credentialed medical staff at IUH Arnett. [*Id.* at 15.] While Korty was originally only responsible for the Arnett Hospital, over her tenure, she also took over the same responsibilities for IU Health's Frankfort and White Memorial Hospitals too. [*Id.* at 14, 17-18.] During her employment, Korty was the only quality coordinator in the West Central Region. [*Id.* at 16-17; DE 33-1 at 1.] Around February 2021, Korty told Baker she was resigning, but she agreed to stay to train her replacement. [DE 33-1 at 3.] At the time of her resignation, Korty was earning $31.53 per hour or $65,583 per year. [DE 33-4 at 10.]

As Baker began the task of finding Korty's replacement, she "wanted the role to focus on increasing provider engagement in setting quality metrics and making the peer

3

review process more robust." [DE 33-1 at 3.]  She reviewed applications and interviewed candidates, and Baker decided she wanted to hire Justin Reagin to fill the position Korty was vacating.  [*Id.*, Baker Dep., DE 33-4, at 7.]  Reagin was an internal candidate; he was already working for IUH as a Clinical Informaticist. [DE 33-1 at 3.] Reagin was well qualified for the position.  He had worked as a nurse, as well as an Associate Administrator at IUH Frankfort Hospital for over two years, with staff management and leadership responsibilities.  *Id.*  Because Baker found Reagin to be such a quality candidate, she wanted to offer a salary he would find acceptable. [DE 33-4 at 12.]

While Reagin was the best candidate for the job, there was a problem.  He was earning substantially more money in his current position.  He was therefore told that he would have to take a pay cut if he wanted the new job. [DE 36-6 at 4.]  Nevertheless, Baker wanted to find a way to offer Reagin a salary that was attractive enough to make it work. [DE 33-4 at 12.] Lori Fenton was the IUH Talent Acquisition Consultant assigned to work on making that happen. [DE 33-6 at 2.]

Baker relied upon, and engaged in discussions with her HR partners, to decide what Reagin's salary should be. [DE 33-1 at 3.]  The initial pay recommendation for Reagin was prepared by Fenton.  [*Id.* at 4.]  In coming up with her recommendation, Fenton considered market range, internal equity, and Reagin's knowledge, skills and abilities. [DE 33-6 at 3.]  Fenton told Baker that she reviewed the market range for the job and was aware that Reagin was in a higher market range in his Clinical Informaticist

4

position than the CNQC role would provide. [DE 33-6 at 3.]  Fenton also told Baker that Reagin was currently making $41.07/hour, or $85,426 annually.  *Id.*  Fenton noted Reagin's leadership experience, as well as the nine years of clinical experience that he and Korty both had. [DE 33-6 at 3; DE 33-1 at 4.]  Fenton, as well as Nicole Jarrett from IUH, both indicated that Reagin's experience acquired in his higher pay grade positions was considered valuable  – in general, higher pay grades indicate experience at a higher level. [Jarrett Dep., DE 33-5, at 13, 14, 17; DE 33-6 at 3.]

Fenton initially proposed offering Reagin between $32.00/hour or $66,560/year and $33.00/hour or $68,640/year. [DE 33-6 at 3.]  This would have been roughly equivalent to what IUH paid Korty for that position. [DE 33-4 at 9.]  But according to Fenton, she "knew there was room to offer him more based on his prior pay and experience under IUH guidelines, [but] [she] provided a conservative initial recommendation to be conscious of the department's budget." [DE 33-6 at 3.]  After Baker reviewed Fenton's recommendation, she responded in an e-mail back to Fenton expressing concern at how big a pay cut Reagin was going to have to take: "Ouch . . . that's a pay cut for sure . . [Korty's] been in the quality coordinator role for 3 years, so [Reagin] has more RN experience and both his Clinical Informaticist and Nursing Supervisor Experience will be valuable in this role." [DE 33-1 at 4; 15.] Nonetheless, Baker initially agreed to offer Reagin $33/hour. *Id*.

But then Baker apparently had second thoughts about offering $33/hour.  She followed up with Fenton: "Do we look at internal equity across IU Health at all?  There

5

are Clinical Nurse-Quality Coordinators at Bloomington and Ball who do similar roles." [DE 33-1 at 4, 15.]  Fenton then reviewed the pay rates of the ten other coordinators within the South Central and East Central regions to compare internal equity, and noted that it "does change things for [Reagin.]" [DE 33-1 at 4-5, DE 33-6 at 4, 9.]  She identified the average pay for that position in those regions as $38.30/hour or $79,664 annually, with the highest at $40.10/hour. [DE 33-6 at 4, 9.]

Based on this additional information, Baker recommended that Fenton offer $38/hour to Reagin. [DE 33-1 at 5, 13.]  Fenton agreed, and that was the amount she first offered to Reagin. [DE 33-6 at 4.]  But Reagin wanted more.  He responded by inquiring if there was "any wiggle room for negotiation at all" in the offered salary. [DE 33-6 at 4, 22.]  Fenton responded that "one thing that IU Health really focuses on is internal equity with other team members in the role; however you do have amazing experience & the skill-set that Laura [Baker] is seeking for this position so I will definitely advocate for that and get back with you as soon as possible." [*Id.* at 4, 21.]

Baker then agreed to increase the offer to $38.76/hour (or $80,621 annually). [DE 33-1 at 5.]  In raising the offer, Baker noted that her budget was "pretty stretched" and she did not think offering him any higher amount was in line with internal equity. [DE 33-1 at 5, 12.]  This time, Reagin accepted the position. [DE 33-1 at 5.]  Here is how Baker articulated the reasons for Reagin's higher pay rate:

> IU Health does market adjustments for clinical nurses on a fairly routine basis, and nurses who work in other positions aren't always included in those adjustments.  Because [Reagin] had maintained a position as a pediatric nurse and as a supervisor, he was given

6

>raises as part of the clinical nurse role. So when he applied for the position, he's - and now the clinical nurse quality coordinator, he already had a higher rate . . .

[DE 33-4 at 13; DE 33-1 at 4.]

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I must take the facts in the light most favorable to the party opposing the motion. *Fulk v. United Transp. Union*, 160 F.3d 405, 407 (7th Cir. 1998).

Korty's only claim is under the Equal Pay Act (EPA) which prohibits wage discrimination on the basis of sex for equal work in jobs that require equal skill, effort and responsibility and which are performed under similar working conditions. *See* 29 U.S.C. § 206(d)(1). To establish a prima facie case under the EPA, Korty must show: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006) (citation omitted).

Everyone seems to agree that Korty is able to meet the prima facie case. The burden therefore shifts to IUH to prove that a statutory affirmative defense applies.

7

*Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017). There are four defenses, any one of which can justify the pay differential. In other words, an employer is not liable if the pay is made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of product; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

IUH contends that Reagin's pay differential was based on the fourth affirmative defense, a factor other than sex. This fourth affirmative defense is admittedly a bit fuzzy. It has been described as a "broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Fallon v. State of Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989). Ultimately, the Seventh Circuit "does not require that the factor other than sex be related to the requirements of the particular position in question, or that it be a business-related reason." *Id.* at 1211. Instead, the question to be asked under the fourth affirmative defense is "whether the factor is discriminatorily applied or if it causes a discriminatory effect." *Id.* Finally, an employer can't just give an after the fact explanation for the pay discrepancy; there must be evidence "that the employer actually relied on that reason." *Lauderdale*, 876 F.3d at 908.

Here, the evidence is clear that there were multiple factors other than sex that legitimize the $15,000 pay difference between Korty and her male successor.

### 1. Market Range/Prior Salary

The e-mail chain between Baker and Fenton makes it plain that IUH considered Reagin's previous salary in determining what he should be offered initially, and in

8

calculating his final offer. Recall that Fenton initially acknowledged that Reagin was making $85,426/year in his current position, and recommended that IUH offer him $32/hour or $66,560/year up to $33/hour or $68,640/year based on his experience and education. [DE 33-1 at 15.] In response, Baker noticed this would cause Reagin to take quite a hit, stating "ouch . . . that is a pay cut for sure" and asked Fenton if they could at least initially offer the $33/hour. *Id.* Fenton then responded that she could look at the internal equity to see if they had room to offer more to Reagin. [*Id.* at 14.]

For Baker to have focused in on Reagin's prior salary was entirely reasonable. Indeed, the Seventh Circuit "has repeatedly held that a difference in pay based on the difference in what employees were previously paid is a legitimate 'factor other than sex.'" *Lauderdale*, 876 F.3d at 908. The Court acknowledges that "[b]asing pay on prior wages could be discriminatory if sex discrimination led to the lower prior wages." *Id.* But Korty has not made that showing at all — nowhere has she shown that Reagin's previous salary was inflated based upon his sex.

IUH has established that its own guidelines provide when a current IUH employee experiences a demotion (like Reagin did here), the talent acquisition coordinators can actually approve a new pay rate at the maximum of the new pay grid. [Foxen Dec., DE 33-2 at 3.] Recall that Reagin held the Clinical Informaticist role prior to applying for Korty's job, and he made approximately $20,000 more per year at that job than IUH was paying Korty for doing hers. It was altogether reasonable for IUH to consider Reagin's previous pay in determining how much to offer him for the new

9

position. Indeed, a slew of courts have arrived at the same conclusion. *See, e.g., Hubers v. Gannett Co., Inc.*, No. 16 C 10041, 2019 WL 1112259, at *4-5 (N.D. Ill. Mar. 11, 2019) (granting summary judgment where undisputed evidence showed that male's base salary was higher than a female's not because of sex, but because of his prior salary); *Purcell v. Indiana Univ-South Bend and Its Chancellor*, No. 3:13 CV 386, 2017 WL 447236, at *4-5 (N.D. Ind. Feb. 2, 2017) (granting summary judgment where female lecturer in music was paid less than male lecturers, where the court found the men had a higher salary due to their higher market value – they had received higher salaries before and the university determined their salaries were necessary to attract a new resident quartet to lecture and perform); *Cooper-Schut v. Visteon Auto. Sys.*, No. IP-01-0899-C-B/G, 2003 WL 1702261, at *13 (S.D. Ind. Mar. 31, 2003) (grating summary judgment on Equal Pay Act claim finding company based its decision to pay a male more than a female for legitimate reasons other than sex, including his prior salary and experience).

Korty candidly admits that the current state of the law in this circuit allows consideration of prior salary as a valid reason "other than sex" to explain a pay disparity. [DE 35 at 8.]  However, she advocates that the Seventh Circuit should join other circuits that refuse to consider prior salary as a factor other than sex because it simply perpetuates a pay disparity between the sexes.[2] While there may be some merit

---

[2] *See, e.g., Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) (holding prior salary is not a separate justification for pay differential); *Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018) (en banc), vacated on unrelated grounds sub. nom *Yovino v. Rizo*, 139 S.Ct. 706 (2019) (holding "prior salary alone or in combination with other factors cannot justify a wage differential" because, otherwise, employers could "capitalize on the persistence of

10

to that position, I am bound to follow the precedent of this circuit. As I have said before, "[i]n a hierarchical system of courts, binding precedent is just that, district court judges are not free to disregard the law as clearly espoused by the Seventh Circuit, until it is either overruled by that court or the Supreme Court." *Szany v. Garcia*, No. 2:17-cv-74-PPS-JPK, 2020 WL 2767356, at *15 (7th Cir. 2020); *see also Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (district judges must follow the decisions of the Seventh Circuit, even if they disagree with the decision).

To the extent Korty looks to the Supreme Court case in *Corning Glass Works v. Brennan*, 417 U.S. 188, 209-10 (1974), to try to sway this court that prior salary should not be considered, that case concluded that "the company's continued discrimination in base wages between night and days workers, though phrased in terms of a neutral factor other than sex, nevertheless operated to perpetuate the effects of the company's prior illegal practice of paying women less than men for equal work." Here, IUH has provided undisputed evidence that Reagin's prior salary was set for a different role (when he was a Clinical Informaticist), and Korty has provided no evidence at all that previous salary was already artificially inflated due to sex; therefore, the broader arguments set forth in *Brennan* just don't apply in this case.

While Korty contends Reagin's prior pay rate is only a pretextual reason for over-paying Reagin because he is male [DE 35 at 13], this is pure speculation. There is no evidence to support such a theory. Korty believes it is telling that Reagin wrote in

---

the wage gap and perpetuate that gap ad infinitum").

an e-mail at the beginning of the application period that "It's never been all about the money." [DE 35 at 12-13, DE 36-3 at 4]. But of course that doesn't mean it wasn't *partly* about the money. Indeed, that's the reason Reagin negotiated for more compensation. Yet, somehow, Korty remains adamant that Reagin did not in fact "negotiate for a higher salary." [DE 35 at 13]. That position is deeply perplexing in light of Reagin's e-mail to Fenton after he received his first offer asking, in reference to compensation, if "there is any wiggle room for negotiation at all?" [DE 33-6 at 22.] Of course he was negotiating salary terms. And Fenton was doing the dance too when she responded by promising to "let [him] know on the salary piece as soon as possible." [*Id.* at 21.]

I don't see anything improper (much less discriminatory based upon sex), in IUH's desire to hire Reagin and, during that process, minimize the pay cut that he would be taking by moving into Korty's role. After all, Reagin was their top candidate and they wanted to do their level best to seal his commitment. As the Seventh Circuit has aptly recognized, "[m]aintenance of an employee's compensation in a transfer between positions is not in our view unusual and avoids the serious problem of 'unmerited' pay reductions." *Covington v. Southern Illinois Univ.*, 816 F.2d 317, 323 (7th Cir. 1987). And Korty cannot contest that IUH specifically considered the market range, and Reagin's prior salary, in setting his pay for the new position. It is right there in the e-mails. As such, IUH has provided a factor other than sex that justifies the wage differential.

**2.     Internal Equity**

There is yet another reason unrelated to sex that explains the pay differential in this case, and that is internal equity.  Fenton and Baker considered (in a documented e-mail) the pay rates of ten other clinical nurse quality coordinators within the South Central and East Central Regions.  [DE 33-1 at 14.]  Korty points out that these regions include some hospitals that are geographically far from IU Arnett, but she does not argue that these jobs are not comparable. [DE 35 at 17.]  Anyway, all of the comparators in the same nurse quality coordinator jobs were female, and most were paid more than Korty. [DE 33-6 at 4, 18.]  Fenton identified the average pay in those regions was $38.30/hour or $79,664 annually, with the highest at $40.10/hour.  *Id.*  Therefore, Fenton told Baker there was room to offer Reagin more, but IUH could not exceed $40.10/hour. [DE 33-6 at 4.]  Fenton then approved Baker's request to initially offer Reagin $38.00/hour.  *Id.*  In response, when Reagin asked if there was any wiggle room in the offered salary, Fenton told him "one thing that IU Health really focuses on is *internal equity* with other team members in the role; however you do have amazing experience & the skill-set that Laura [Baker] is seeking for this position so I will definitely advocate for that and get back with you as soon as possible."  *Id.* (emphasis added).  Baker agreed to increase the offer to $38.76 per hour (or $80,621 annually), which still was in line with the average pay of clinical nurse quality coordinators (and below the highest earner in that position who was a female in a comparable region), but in doing so she noted that offering any more would not be in line with "internal equity." [DE 33-1 at 5.]

13

There is no doubt at all that internal equity was considered in determining Reagin's salary, and it is a sex-neutral basis for coming up with his salary. In response, Korty claims "[i]f internal equity were a bona fide factor other than sex, IU Health would have applied it equally to Korty." [DE 35 at 15.] But Korty was hired at a different point in time, and with different work experience than Reagin. We don't know anything about IUH's budget when Korty was hired in 2017, or whether she tried to negotiate a higher salary (like Reagin did), or if she accepted what she was initially offered.

Additionally, it is really a stretch for Korty to argue that "[i]f Reagin's pay was attributable to internal equity, surely internal equity would dictate that Korty's pay also be increased for the month that they overlapped." [DE 35 at 16.] At that point in time, Korty had already voluntarily turned in her resignation, and just stayed on an additional month to train Reagin. It seems a bit fanciful to expect IUH to gratuitously pay an employee who has voluntarily resigned more money during the one month transition. Such a notion is not ground in reality, nor is it required by the EPA. The section cited by Korty, 29 C.F.R. § 1620.25, dealing with the equalization of rates only applies "when a prohibited sex-based wage differential has been proved" and in this case, Korty has not shown that IUH used a sex-based wage differential.

### 3. Knowledge, Skills and Experience

Finally, Reagin's knowledge, previous experience, and skills also are another factor unrelated to sex that justify his salary. IUH's compensation guidelines allow for

14

pay differences when based on relevant work experience, performance or seniority. [DE 33-2 at 3.] Baker thought Reagin's experience as a current RN, Clinical Informaticist, and Nursing Supervisor would help him increase provider engagement in setting quality metrics and improving the peer review process. [DE 33-4 at 12; DE 33-1 at 3.] Although Korty and Reagin both had nine years of clinical experience, Baker thought Reagin would be a great fit due to his knowledge and experience and Fenton recognized his experience as valuable. [DE 33-6 at 3; DE 33-1 at 3.] This clearly provides another factor other than sex that justifies Reagin's pay rate.

According to Korty's subjective belief, Reagin's qualifications were not superior to hers. [DE 35 at 19.] But they also were not direct comparators - it was not like Korty and Reagin applied for the same job position at the same time. She was leaving and he was picked as her replacement. What Korty cannot dispute is that IUH considered Reagin's qualifications in hiring him – Fenton and Baker discussed it in their March 5, 2021 e-mail chain. [DE 33-1 at 15.]

Finally, as a last ditch effort, Korty claims that even if Reagin's qualifications were superior to hers, "that superiority is to be disregarded when the superiority is in excess of the skill, experience, training, education, and/or ability required of the position," citing 29 C.F.R. § 1620.15(a). [DE 35 at 19.] However, section 1620.15 defines "jobs requiring equal skill in performance" for the purpose of establishing whether the EPA would even apply in the first place – not for purposes of evaluating the "factor other than sex" defense. The Seventh Circuit has explained that a "factor other than

15

sex" to support a particular pay decision "need not be 'related to the requirements of the particular position in question,' nor must it even be business-related." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1462 (7th Cir. 1994) (quoting *Fallon v. State of Ill.*, 882 F.2d 1206, 121 (7th Cir. 1989) (noting "[e]mployers may prefer and reward experience, believing it makes a more valuable employee, for whatever reason")). As such, Reagin's experience, background, and skill set was a proper consideration for IUH to examine in determining his salary. And this is another sex-neutral reason that accounts for his salary discrepancy.

***

To summarize, IUH has articulated at least three factors other than sex that buttress their decision to offer Reagin what amounted to about $15,000 more than Korty was earning in the same position. Korty has not identified anything pretextual about these reasons. In fact, they are all well documented and seem to be legitimate business reasons that were evaluated and discussed (in writing) prior to offering Reagin his final salary. Therefore, Korty's claims fail.

## Conclusion

For the aforementioned reasons, Plaintiff's Motion to Strike [DE 37] is DENIED as MOOT. Defendant Indiana University Health, Inc.'s Motion for Summary Judgment [DE 31] is GRANTED, and the case is DISMISSED WITH PREJUDICE.

ENTERED: December 21, 2022.

                                                   s/ Philip P. Simon
                                                   PHILIP P. SIMON, JUDGE
                                                   UNITED STATES DISTRICT COURT